**TRANSCONTINENTAL BUS SYSTEM, INC., Appellant,**

v.

**Edna R. SCIRRATT et al., Appellees.**

**No. 29.**

Court of Civil Appeals of Texas.

Tyler.

Feb. 20, 1964.

Rehearing Denied March 12, 1964.

Hobert Price, Strasburger, Price, Kelton, Miller & Martin, Dallas, for appellant.

Ben T. Warder, Jr., Carter, Gallagher, Jones & Magee, Ivan Irwin, Shank, Irwin & Chester, Dallas, for appellees.

MOORE, Justice.

Plaintiffs, Edna Scirratt and her sister Hazel Scirratt, instituted this suit against the defendant, Transcontinental Bus System, Inc., for damages resulting from a collision between the automobile driven by Edna Scirratt and in which Hazel Scirratt was a passenger, and the defendant's bus, which was operated by its driver, Fred Conley. The collision occurred on May 26, 1962, at 5:30 p.m. in the City of Dallas on Garland Road near Magellan Circle. Garland Road runs east and west and is composed of three lanes for east bound traffic. Both the bus and the automobile driven by Edna Scirratt were proceeding east in the same direction. It is the contention of the plaintiffs, Edna Scirratt and her sister Hazel Scirratt, that they were proceeding in the outside lane of traffic next to the curb when the driver of the bus turned his vehicle into the left rear side of their automobile, causing it to go out of control and veer to the left across the highway where it struck a utility pole in the esplanade, causing them severe injuries. It is the contention of the defendant bus company that the bus at all times remained in the middle or center lane of the highway and that while plaintiffs were passing the bus on the right hand side, plaintiff Edna Scirratt drove her automobile to the left, striking the right front corner of the bus. The trial was to a jury which found that the accident was caused by the negligence of the

driver of the bus in that he failed to keep a proper lookout; failed to keep the bus in the middle east-bound lane; failed to make timely application of the brakes and to sound the horn. The jury exonerated plaintiff Edna Scirratt of any act of contributory negligence and found that she had suffered damages in the amount of $35,696.42, as well as the sum of $1,612.90 for damages to her automobile. The jury found that Hazel Scirratt had suffered damages in the amount of $90,469.96.

Defendant, Transcontinental Bus System, Inc., brings twenty points of error, alleging in the first fourteen points that the trial court erred in failing to grant its motion for new trial or for judgment notwithstanding the jury verdict, because there was no evidence, or at least insufficient evidence, to support the judgment and in the alternative that the findings by the jury of negligence against defendant's driver as well as the failure, by the jury, to find negligence against the plaintiffs was so contrary to the overwhelming weight and preponderance of the evidence as to be wrong and unjust and that the judgment should be set aside and a new trial granted. These assignments require that this court examine the statement of facts in accordance with the rule announced in In re King's Estate, 150 Tex. 662, 244 S.W.2d 660. We have carefully examined the Statement of Facts and have concluded that, as a matter of law as well as a matter of fact, the judgment is supported by the evidence. In support of our conclusion we will briefly review the record before us.

Plaintiff, Hazel Scirratt, testified that at the time of the accident she was fifty one years of age, was in good health, and had been employed for over 25 years with Columbia Pictures doing office work; that she earned $75.28 per week, or approximately $3700.00 per year. That she and her sister, neither being married, lived together and were buying a home in Mesquite, near Dallas; that on the date of the accident she and her sister had left their employ-

ment at approximately 5 o'clock and were driving to their home; that at the time of the accident her sister, Edna Scirratt, was driving and she was reading a newspaper, seated in the right front seat of the automobile; that she did not see or know anything as to how the accident happened. She testified that when she recovered consciousness she was in Baylor Hospital where she remained for a period of almost four months. That her right leg was severely broken, requiring the same to be placed in traction and to later be placed in a cast from her hip to her foot; that she had a broken nose, cuts and bruises on the forehead above her right eye; one of the bones below her right eye was broken; four ribs on the right side were broken, her right arm was broken at the wrist; her left kneecap was fractured and that several months after the accident she developed trouble in her left hip requiring further hospitalization and an operation in which the upper portion of her femur or thigh bone was removed and a metal ball was inserted in the joint; that she now suffers continuous pain in her back, legs and hip; that the right leg is shorter than the left leg, requiring her to wear a built-up shoe; she has trouble with her right arm; is unable to work and is required to walk on crutches; that her medical and hospital bill to the date of the trial was $5,369.96.

Her physician, Doctor Eugene Legg, testified that it was necessary to place an artificial metal hip joint or ball in her left hip at the top of the femur in order to relieve her pain and to permit her to walk. He further testified that in his opinion that even though there was probably some arthritis in the left hip joint previous to the injury, same was accentuated by the accident and was what he would refer to as traumatic arthritis, which was secondary to the accident. He further testified that there was a severe comminuted fracture of the right femur or thigh bone affecting the knee as well as fractures to the ribs, left kneecap, and right arm. He testified that she now suffers pain and will in all probability suffer in the future; that she has reached her maximum recovery and that in his opinion the condition is permanent; that she will never be able to work again and that she will require future medical treatment throughout her life.

Edna Scirratt testified that she was fifty years of age on the date of the accident; that for the past 16 years she had been working for Hunt Oil Company as a secretary and earning $450.00 per month, averaging between $5,000.00 and $5,500.00 per year, and before that she had worked 16 years for Sinclair Oil Company; that both she and her sister were in good health prior to the time of the accident. She testified that just before the accident she was driving in the outside or curb lane of Garland Road and when she first saw the bus in her rear view mirror it was in the middle lane about a half block back; that the next time she saw the bus that the front end of it was immediately to her left and was turning into her; that she had not changed lanes but that the bus had turned from the middle lane into her lane and had struck her automobile on the left side, abreast of where she sat; that the impact knocked her automobile out of control and that it went left across the highway, crossing the other two lanes of traffic and struck a utility standard in the center of the esplanade, knocking her unconscious. She denied that she was attempting to pass the bus or that she told the investigating officer that she was overtaking the bus. She spent six weeks in the hospital. She suffered broken ribs on the left side and that two weeks after the accident she suffered a blood clot in her left lung, from which she has never recovered; that although she returned to her work after six weeks and is now working at her same salary, she is now short of breath and breathes with great difficulty, requiring constant medication and medical treatment. She denied that she had ever had asthma or any trouble with her lungs

before the accident, although she had been told by her mother that she had asthma as a child.

Her physician, Doctor Alex Grover, testified that at the time he first saw her in the hospital she was near death with acute bronchial asthma due to the fracture of the sixth and eighth ribs and thrombophlebitis in her lower left leg which caused a blood clot to lodge in the lung; that this has caused her to have trouble in the lungs, has resulted in pulmonary emphysema causing a decrease of the ability of the lungs to function to 30–40% of normal. He further testified she would need medical attention for the remainder of her life and that her life span will be shortened by five to ten years; that the pulmonary emphysema, with which she now suffers, was a result of the injuries she received. He denied that he received any history from her of previous respiratory trouble or that he found pulmonary fibrosis present in her X-rays on the date she entered the hospital. Doctor Joe Hawkins, a radiologist at Baylor Hospital, who was called by defendant, testified, however, that he had examined the X-rays made on the date of her admission and in reading and interpreting them he found pulmonary fibrosis. Doctor Grover testified that pulmonary fibrosis is not a progressive disease, but is a static condition caused by the formation of scar tissue as a result of injury or disease in the lungs.

Frances Bonfield, one of the witnesses for the plaintiffs, testified that she was riding in the bus on the date of the accident and was seated on the right hand side of the bus next to the window. She testified that when she first saw plaintiffs' automobile it was in the right hand or curb lane and about one-third of it was ahead of the bus. She then felt and saw the bus turn to the right and saw the right front corner of the bus strike the rear one-third of the automobile on its left side; that the collision occurred slightly in the automobile's right hand or curb lane; that when the bus hit the car it spun it around, and then

hit the automobile again further up toward the front and then came apart and then hit it again and again, that the automobile then disappeared and she did not see it again until she saw it against the utility pole in the esplanade. She admitted she could not see the dividing line between the center lane and the curb lane.

Officer Shutler, an accident investigator with the Dallas Police Department for five years, testified that he investigated the accident, arriving at the scene within thirty minutes. He testified that he saw the tire marks of the right hand tire of the automobile leading from a point in right hand curb lane veering to the left to the place where the automobile struck the utility pole in the esplanade. He did not measure the distance of the tire marks from the curb. At a point eight feet from the curb and at a point about even with the place where the tire marks commenced, he found a "smudge" which he thought was made by the left rear tire of plaintiffs' automobile. It appeared to be a skid mark made by a vehicle sliding sideways. It was about five or six feet to the left of the swerve mark and was in the curb lane, eight feet from the curb, which would put it two feet to the right of the line dividing the center lane and curb lane or two feet inside the curb lane of traffic. He testified he saw white paint on the front right corner of the bus where the bumper wraps around the bus; that there was white paint on the lug bolts that fasten on the front wheel of the bus. He testified that the right rear door of the automobile was mashed in and there were gouged marks in the metal where the rear door joins the body which he took to have been gouged or clawed out by the lugs on the front wheel of the bus. He was of the opinion that the collision occurred near the point where he saw the "smudge" tire mark which was two feet on the inside of the curb lane. He testified that in his opinion the accident occurred in the curb lane and not in the center lane, although he found no debris of any kind

in either lane. He testified that he talked to Edna Scirratt at the hospital a short time after the accident and she told him she was passing the bus at the time of the collision, and from this, together with his investigation on the ground, it was his opinion that the accident occurred while she was passing the bus.

Numerous photographs were introduced in evidence showing a white mark on the right front bumper of the bus as well as white markings on the lugs on the right front wheel. Photographs of the automobile showed the left rear door to be caved in, as well as gouge marks in a semi-circle at a point on the left side of the automobile where the rear part of the back door joins the body, indicating they were probably caused by the lug bolts on the wheel of the bus. There was a black mark on the rear fender indicating same had been struck. The front end of the automobile received extensive damage when it hit the utility pole. No witnesses were found who viewed the accident at the scene.

Defendant, Transcontinental Bus System, Inc., called as witnesses, among others, Jean Berry, Brenda Boyd, Joyce Miller, Mrs. Berry Boyd Casey, Barbara Adair, Eugene Loerch, and Mrs. Lee McClain, all of whom were passengers on the bus. None of the witnesses testified that they saw the collision between the bus and the automobile; however, each of them testified that they either heard or felt the impact of the collision. They each maintained that the bus, at all times, remained in the center lane of traffic and did not turn to the right or left and that when the bus finally came to a stop it remained in the center lane of traffic. Witnesses Casey, Adair, Loerch, and McClain, each testified that they saw plaintiffs' automobile passing the bus on the right hand side just before the impact. Witness Casey, who was seated on the right hand side of the bus next to the window, testified she saw the driver of the automobile "twisting and fighting" with the wheel, as she passed. Witness McClain said she heard or felt a bump on the rear of the bus, before she heard and felt the one at the front of the bus.

The testimony of Fred Conley, the driver of the bus, was by way of deposition, he having died about a week before the trial. He testified his age was 58 and he had been employed as a bus driver with the company since 1944. He testified that for a distance of approximately two blocks before the collision he had traveled in the center lane of traffic; that neither immediately before, nor at the time of the impact, did he turn the bus to the right or left and the bus was completely in the center lane of traffic, traveling 28 miles per hour. He testified that he did not feel, see or hear the impact of the collision. The first thing he saw was the plaintiffs' automobile come around the right corner of the bus and cross the street directly in his path at about 35 miles per hour, proceeding across the center lane, crossing the inside lane and striking the utility pole in the esplanade. He testified that immediately upon seeing the automobile in his path he applied his emergency brake which prevented the front of his bus from striking the automobile. He testified he then stopped the bus in the center lane of traffic about four or five lengths from the point where the automobile turned in front of him, and left it standing in that position until directed to move it after he had returned from checking on the automobile and calling his employer. Police officer Jones testified that he directed Conley to move the bus off the street because same was partially blocking traffic, in that the right front wheel was approximately two or two and a half feet over in the curb lane, with the rear wheels in the center lane where it had been left by Conley. Conley further testified that he did not have his "turn" signal on at the time of the collision. Roy Clark, a filling station operator where Conley made a phone call to his employer after the collision, testified that he heard Conley tell his employer that he had been involved in an accident and some people

were hurt and that after this conversation Conley told him he had his blinker light on and his hand sticking out.

█ Although the testimony conflicts in some respects, the jury resolved the conflicts in favor of the plaintiffs and we find the evidence to be sufficient to support their findings. Burlington-Rock Island R. Co. v. Ellison, 140 Tex. 353, 167 S.W.2d 723; Benoit v. Wilson, 150 Tex. 273, 239 S.W.2d 792; Dallas Ry. & Terminal Co. v. Graham (Tex.Civ.App.) 185 S.W.2d 180; Henwood v. Neal (Tex.Civ.App.) 198 S.W.2d 125; Miller v. Tilton (Tex.Civ.App.) 289 S.W. 2d 426.

█ Defendant next complains by points fifteen and seventeen that the trial court erred in overruling their objections to the damage issues submitted on behalf of Edna Scirratt because the court failed to instruct the jury that she was not to be allowed damages for pre-existing pulmonary fibrosis.

Plaintiffs did not plead an aggravation of a pre-existing condition or infirmity, nor did the defendants allege a pre-existing condition or infirmity as contributing to the present condition of plaintiff Edna Scirratt. The only proof on this subject came from the testimony of Doctor Joe Hawkins, who testified that he found pulmonary fibrosis in the X-rays which were taken the day she was admitted to the hospital. His testimony does not show the extent or the degree of such condition at that time, nor did he testify that it was such that it would have been expected to cause her pain or incapacity. Doctor Grover testified that from his examination of the X-rays it was impossible to determine whether or not there was pulmonary fibrosis present because same were taken while the patient was in a state of shock and at a time when the lungs were in a deflated condition. Edna Scirratt denied that she had ever had any respiratory problems or had ever suffered any pain or incapacity prior to the accident. Her lengthy work record of sixteen years with Hunt Oil Company and sixteen years with Sinclair

Oil Company would seem to lend credit to her testimony. The testimony of Frank Turner, her immediate superior at Hunt Oil Company, to the effect that she had worked under him for over three years before the accident and had properly performed all her duties assigned her in a satisfactory manner and appeared to be in good health, would further indicate that if she ever had pulmonary fibrosis, same had little or no effect upon her ability to work. Doctor Grover attributes her present condition to the accident and not to any pre-existing condition. There was no testimony that the pulmonary fibrosis was in any way affecting her general health prior to the time of the accident.

█ Under points sixteen and eighteen, defendant claims error by the trial court having overruled their objection to the damage issue submitted on behalf of Hazel Scirratt because the issue failed to contain an instruction that she was not to be allowed damages for any pre-existing arthritis in and to her left hip. Here again, it is pointed out that neither the pleadings of the plaintiffs nor defendant contain any allegation with regard to pre-existing conditions. The only proof in regard to pre-existing arthritis in regard to Hazel Scirratt is to be found in the testimony of her physician, Doctor Eugene Legg. On cross-examination, he testified that there was probably some arthritis in the left hip joint prior to the injury due to the fact that all people develop arthritis to some extent as they grow older. Plaintiff testified that she had never suffered with any pain or disability in her left hip before the date of the accident and her long work record of over twenty-five years with the same employer would tend to lend credit to her testimony. Her employer, Ross Morgan, testified that he had worked with her for the past nineteen years and that she had been in good health and had always been capable of performing her duties, which required physical activity, up to the date of the accident. Doctor Legg testified that her present condition in the left hip was caused by the accident

and was what he would refer to as traumatic arthritis. He was of the opinion that the pre-existing arthritis in the joint was not such as would cause any pain or disability but for the injury. Based upon this testimony it is defendant's contention that each of the damage issues submitted on behalf of each of the appellees, Edna Scirratt and Hazel Scirratt, should have contained an additional qualifying instruction advising the jury that they could not consider or award any damages for a pre-existing bodily condition, disease, or infirmity. This question has been before the courts on numerous occasions. The rule is said to be that such an instruction is required if (a) there is evidence of a definite infirmity on plaintiff's part aside from injury due to the accident; (b) there is evidence of a causal connection—which might be close proximity in time—between such infirmity and some pain or disability suffered after the accident; and (c) confusingly close intermingling between the infirmity not due to the accident and that due to the accident, so that the jury might be misled into awarding money for the total pain and disability accruing from both, rather than for that accruing only from the accident. Dallas Ry. & Terminal Co. v. Ector, 131 Tex. 505, 116 S.W.2d 683; Dallas Ry. & Terminal Co. v. Orr, 147 Tex. 383, 215 S.W.2d 862; Dallas Railway & Terminal Co. v. Van Gilder (Tex.Civ.App.) 301 S.W.2d 724; Baltazar v. Neill (Tex.Civ.App.) 364 S.W.2d 846.

Applying these principles to the record in this case, we have concluded that the proof is insufficient to show that either of the alleged pre-existing conditions charged against either Edna Scirratt or Hazel Scirratt ever at any time before the accident caused either of them any pain, suffering or disability so as to show a definite infirmity. Nor do we believe that the alleged pre-existing infirmities, if any, were so closely intermingled with the injuries due to the accident that the jury might be misled if the instruction was not given. We therefore hold that the evidence relating to the extrinsic infirmities is insufficient to require

the special instruction in connection with the damage issue of either of the plaintiffs.

As we view the testimony, any pre-existing pulmonary fibrosis on the part of Edna Scirratt as well as any pre-existing arthritis on the part of Hazel Scirratt can be said to have been dormant or incipient at the time of the collision. The lung condition of Edna Scirratt did not develop until approximately two weeks after the accident and the arthritic condition of Hazel Scirratt did not develop until almost a year after the accident.

"The damages which appellee was entitled to recover were the damages resulting to himself, conditioned as he was at the time of the injury, and not such damages as he might have been entitled to had his condition been different. That the injury resulting from the negligence of appellants may have been aggravated or more easily caused by reason of the fact that the limb had received a former injury cannot affect the question of right to or measure of damages. Had the latter part of the charge refused been given, the jury would probably have felt authorized to inquire whether the injury would have occurred at all if the weakness from the former injury had not existed, which would not have been proper if the injury in fact resulted from the negligence of appellants." Driess v. Friederick, 73 Tex. 460, 11 S.W. 493; Beaumont Iron Works Co. v. Martin (Tex.Civ.App.) 190 S.W.2d 491; Thompson v. Quarles (Tex.Civ.App.) 297 S.W.2d 321; 17 Tex.Jur.2d 188, Sec. 121.

By point nineteen defendant complains of the failure of the trial court to grant a new trial because of the argument of plaintiffs' counsel. The argument was as follows:

"I have heard it said that allergists and dermatologists never cure anybody—they never kill anybody, either, but once you get under their care in a

critical case, you are never away from constant medical treatment."

Such argument was objected to as amounting to unsworn testimony outside the record. Upon overruling the objection the court admonished the jury that counsel's statements were not evidence, and his opinions were only valid insofar as they are based upon evidence.

■ At the time of the argument counsel was arguing the question of future damages. It will be recalled that Doctor Grover testified that he was an allergist and that Edna Scirratt had been to him every two or three weeks since she was discharged from the hospital and would need continuous medical treatment for the remainder of her life. We are persuaded to believe that such statements and remarks were legitimate deductions and inferences from the testimony and as such, were not improper.

■ Even though the argument be construed to be improper, we cannot say that the same was reasonably calculated to cause, and probably did cause, the rendition of an improper judgment, especially in view of the prompt instruction given by the court to the jury. Rule 434, Texas Rules of Civil Procedure; Aultman v. Dallas Railway & Terminal Co., 152 Tex. 509, 260 S.W.2d 596; Rogers v. Broughton (Tex.Civ.App.), 277 S.W.2d 121; Milstead v. Aynesworth (Tex.Civ.App.), 341 S.W.2d 942.

In point twenty, defendant again complains of the argument of plaintiffs' counsel wherein he stated "and if there is one of us here who faced the possibility of someday being in somebody's charity ward in a hospital or really knowing what poverty is, and it is not pleasant to think about—it is Hazel Scirratt."

Defendant did not object to such argument at the time it was made. Defendant contends however that such argument was a reference to the present poverty of Hazel Scirratt and was so prejudicial that the harmful effect thereof could not have been removed by an instruction. Defendant does not contend that the harmful effect thereof resulted in excessive damages nor does defendant make any attack on the findings of the jury as to the amount of the damages being excessive.

■ The record reveals that at the time counsel for plaintiffs made this argument he was arguing on the question of future damages. It was an appeal to the jury to award a sufficient amount of damages so that she would not be compelled to become a ward of charity, in view of her permanent disability. It has been held that an argument which is improper only because its nature is calculated to inflame the minds and arouse the passion and prejudice of jurors is usually regarded as being of a "curable" type and that in order to require a reversal, the argument must have been such, when considered in its proper setting, as was reasonably calculated to cause such prejudice to the opposite party that an instruction by the court could not have eliminated the probability that it resulted in an improper verdict. Rules 434 and 503, Texas Rules of Civil Procedure; Texas Employers' Ins. Ass'n v. Haywood, 153 Tex. 242, 266 S.W. 2d 856; Wade v. Texas Employers' Ins. Ass'n, 150 Tex. 557, 244 S.W.2d 197; Ramirez v. Acker, 134 Tex. 647, 138 S.W.2d 1054; Ellison v. Patton (Tex.Civ.App.), 303 S.W.2d 855.

■ We do not regard the argument as being one wholly pointing up the present poverty of plaintiff, and thus improper, but rather as one pointing out her plight in the event the jury should fail to provide her with ample means to maintain herself. At any rate, the argument was not beyond correction by means of a proper instruction, but by failing to object, defendant waived such right, and for that reason the point is overruled.

The judgment of the trial court is affirmed.